**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

| | |
|---|---|
| ————————————————————— ) | |
| NATIONAL ASSOCIATION OF TOBACCO ) | |
| OUTLETS; R.J.  REYNOLDS TOBACCO ) | |
| COMPANY; PHILIP MORRIS USA INC.; ) | |
| LORILLARD TOBACCO COMPANY, ) | |
| ) | |
|   Plaintiffs, ) | CIVIL ACTION |
| ) | NO.  4:11-CV-40110-DPW |
|  v. ) | (Electronically Filed) |
| ) | |
| CITY OF WORCESTER, Massachusetts; ) | |
| DIVISION OF PUBLIC HEALTH of Worcester, ) | |
| Massachusetts; B.  DALE MAGEE, in his official ) | |
| capacity as Commissioner of Public Health of ) | |
| Worcester, Massachusetts; MICHAEL V. ) | |
| O'BRIEN, in his official capacity as City Manager ) | |
| of Worcester, Massachusetts, ) | |
| ) | |
|   Defendants. ) | |
| ————————————————————— ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION**
**FOR A PRELIMINARY INJUNCTION**

This is an action by three tobacco companies and a retail tobacco trade association ("Plaintiffs" or "Tobacco Companies") challenging a Worcester city ordinance restricting certain advertising of tobacco products as violative of the First Amendment.  The defendants, the city of Worcester and its commissioner of public health and city manager ("Defendants" or "City"), defend the ordinance and oppose the request for a preliminary injunction on the grounds that the ordinance complies with the test for measuring the validity of a government restriction on commercial speech as first articulated in <u>Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York</u>, 447 U.S.  557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

## I.  Background/ Statement of Facts

On May 10, 2011 the Worcester City Council adopted an amendment to the City's Revised

Ordinances which inserted into the City's codified ordinances a new subsection (i)(1) as follows:

> "No person shall display any advertising that promotes or encourages the sale or use of cigarettes, blunt wrap or other tobacco products in any location where any such advertising can be viewed from any street or park shown on the Official Map of the city or from any property containing a public or private school or property containing an educational institution."

City of Worcester Revised Ordinances of 2008, Chapter 8, Section 3.  See Section 5 of the

enacting ordinance of May 10, 2011, a copy of which is submitted under the affidavit of City

Clerk David J. Rushford attached hereto as Exhibit 1. (Hereinafter "Ordinance").

Prior to adopting the Ordinance the city council made a series of findings explaining the

interests it seeks to advance by adoption of the Ordinance.  Those findings include the following

(listed with the numbers as appearing in the Ordinance as enacted):

(3)  There are an estimated 31,265 smokers who reside in the city of Worcester;

(4)  23.7% of adults in the city of Worcester over 18 years of age smoke, a level which is 47% higher than the statewide average of 16.1%;

(5)  Cigarette smoking among middle-aged residents (age 45-64) is at the 23.7% level, which is 42% higher than the statewide level of 16.7%;

(7)  The death rate of Worcester residents from tobacco on a per capita basis is approximately 250 individuals annually, or five human lives lost per week;

(8)  At least one-half of all smokers begin smoking before the age of eighteen and an estimated 3,000 minors begin smoking every day in the United States;

(9)  Despite a progression of federal laws, state laws and city ordinances enacted over the past several decades which prohibited the sale of tobacco products to minors, required warning labels on cigarette packages, prohibited television and radio advertising of tobacco products, prohibited the distribution of free cigarettes, prohibited smoking in public places, prohibited smoking in restaurants, prohibited smoking in workplaces and buildings, prohibited vending machine sale of tobacco products, required tobacco sales permits, and, despite the initiation and settlement of lawsuits against tobacco companies where these companies have paid and continue to pay hundreds of billions of dollars to compensate all state governments, the District of Columbia, Puerto Rico and the Virgin Islands, for the damages caused by tobacco products, the marketing strategies continue and the rampant use of tobacco products and the death and devastation resulting therefrom continue at the epidemic levels described herein;

Prior to final adoption of the Ordinance the city council also adopted a series of findings made by the Congress of the United States in section two of the Family Smoking Prevention and Tobacco Control Act, Public Law 111-31, June 22, 2009, 123 Stat 1776 (Hereinafter "Tobacco Control Act").  Those findings[1] are contained in the "City Council Order Authorizing Ordinance" which is attached to City Clerk Rushford affidavit as Exhibit 2 and include:

 (1) A consensus exists within the scientific and medical communities that tobacco products are inherently dangerous and cause cancer, heart disease, and other serious adverse health effects.  (Tobacco Control Act finding # 2 - verbatim).

 (2) Nicotine is an addictive drug.  (Tobacco Control Act finding # 3 - verbatim).

 (3) Tobacco advertising and marketing contribute significantly to the use of nicotine-containing tobacco products by adolescents.  (Tobacco Control Act finding # 5 - verbatim).

 (4) Because past efforts to restrict advertising and marketing of tobacco products have failed adequately to curb tobacco use by adolescents and adults, comprehensive restrictions on the sale, promotion, and distribution of such products are needed to reduce and prevent the premature loss of life of city residents caused by tobacco products marketed, advertised and sold in the city of Worcester.  (Tobacco Control Act finding # 6 "Because past efforts to restrict advertising and marketing of tobacco products have failed adequately to curb tobacco use by adolescents, comprehensive restrictions on the sale, promotion, and distribution of such products are needed.").

 (5) Tobacco use is the foremost preventable cause of premature death in America.  It causes over 438,000 deaths in the United States each year and approximately 8,600,000 Americans have chronic illnesses related to smoking.   On a per capita basis, five Worcester residents suffer premature death each week from tobacco products and approximately 5,000 Worcester residents have chronic illnesses related to smoking.  (Tobacco Control Act finding # 13 – "Tobacco use is the foremost preventable cause of premature death in America. It causes over 400,000 deaths in the United States each year, and approximately 8,600,000 Americans have chronic illnesses related to smoking.").

 (6) Reducing the use of tobacco by minors by just fifty percent would prevent well over 10,000,000 of today's children nationwide from becoming regular, daily smokers, saving over 3,000,000 of them from premature death due to tobacco-induced disease. Such a reduction in youth smoking would also result in approximately $75,000,000,000 in savings attributable to reduced health care costs. On a per capita basis, such a reduction in the use of tobacco by minors in Worcester would prevent almost 6,000 of Worcester's children from becoming daily smokers, saving almost 1,800 of them from premature death due to tobacco-induced disease

---

[1] The city council, by vote of July 19, 2011, corrected a recordkeeping error which showed that this Order was "filed" rather than adopted on April 12, 2011.

and reducing health care costs by almost $45 million citywide.  (Tobacco Control Act finding # 14 – "Reducing the use of tobacco by minors by 50 percent would prevent well over 10,000,000 of today's children from becoming regular, daily smokers, saving over 3,000,000 of them from premature death due to tobacco-induced disease. Such a reduction in youth smoking would also result in approximately $75,000,000,000 in savings attributable to reduced health care costs.").

(7) In 2005, the cigarette manufacturers spent more than $13,000,000,000 to attract new users, retain current users, increase current consumption, and generate favorable long-term attitudes toward smoking and tobacco use.  (Tobacco Control Act finding # 16 – verbatim).

(8) Tobacco advertising expands the size of the tobacco market by increasing consumption of tobacco products including tobacco use by young people.  (Tobacco Control Act finding # 22 – verbatim).

(9) Comprehensive advertising restrictions will have a positive effect on the smoking rates of young people and adults.  (Tobacco Control Act finding # 25 – "Comprehensive advertising restrictions will have a positive effect on the smoking rates of young people.").

(10) Restrictions on advertising are necessary to prevent unrestricted tobacco advertising from undermining legislation prohibiting access to young people and providing for education about tobacco use.  (Tobacco Control Act finding # 26 - verbatim).

(11) International experience shows that advertising regulations that are stringent and comprehensive have a greater impact on overall tobacco use and young people's use than weaker or less comprehensive ones.  (Tobacco Control Act finding # 27 - verbatim).

The plaintiffs seek a declaration from the Court that the Ordinance, both on its face and as-applied, infringes their rights under the First Amendment of the U.S. Constitution.  (Complaint, ¶ 4 & ¶ 16).  The effective date of the Ordinance was June 24, 2011 and the Defendants agreed to stay enforcement of the Ordinance pending a decision from this Court on the Plaintiffs' request for a preliminary injunction.

## II.  Standards for a Preliminary Injunction

In determining whether to issue a preliminary injunction the Court must weigh four factors: "(1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the

effect (if any) of the court's ruling on the public interest." <u>Charlesbank Equity Fund II v. Blinds to Go, Inc.</u>, 370 F.3d 151, 162 (1st Cir. 2004). The "sine qua non of this four-part inquiry is likelihood of success on the merits." <u>New Comm Wireless Services, Inc., v. SprintCom, Inc.</u>, 287 F.3d 1, 9 (1st Cir. 2002). "[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." <u>Jean v. Massachusetts State Police</u>, 492 F.3d 24, 27 (2007) citing <u>New Comm Wireless Servs., Inc. v. SprintCom, Inc.</u>, <u>supra</u> at 9.

The Plaintiffs lack a substantial likelihood of success on the merits because the Ordinance complies with the test for measuring the validity of a government restriction on commercial speech as articulated in <u>Central Hudson Gas & Elec. Corp. v. Public Serv. Commission of New York</u>, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)(hereinafter "<u>Central Hudson</u>"). Therefore, Plaintiffs' application for preliminary injunction should be denied.

**Argument**

**A.** **The Plaintiffs Are Not Likely To Succeed On The Merits Of Their Claims Because The Ordinance Is A Valid Regulation Of Commercial Speech Under The Standard Articulated In *Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York*.**

There is no dispute that the Ordinance, as it restricts the advertising of tobacco products in certain public places within the city of Worcester, involves commercial speech, which is speech which does "no more than propose a commercial transaction," <u>Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.</u>, 425 U.S. 748, 762, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976) and which is "related solely to the economic interests of the speaker and its audience." <u>Central Hudson</u>, 447 U.S. at 561. <u>See</u> <u>Lorillard Tobacco Co. v. Reilly</u>, 533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001) (hereinafter "<u>Lorillard Tobacco</u>") (State attorney general's regulation preventing tobacco advertising within 1,000 feet of a school or park analyzed as commercial speech). As such, any determination whether the Ordinance unlawfully impairs the plaintiffs' First Amendment rights requires analysis under the standards established by the Supreme Court in <u>Central Hudson</u>.

The framework for analyzing regulations of commercial speech articulated by <u>Central Hudson</u> contains four elements:

> At the outset, we must determine whether the expression is protected by the First Amendment.  For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading.  Next, we ask whether the asserted governmental interest is substantial.  If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

<u>Central Hudson</u>, at 566.  This test involves an intermediate level of judicial scrutiny.  This standard does not require that the regulation be narrowly tailored to advance a compelling government interest, but rather requires only "that there be a 'reasonable fit' between the government's regulation and the substantial governmental interest sought to be served."  <u>Board of Trustees of State University of New York v. Fox</u>, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989)(<u>Central Hudson</u> test satisfied by ban on demonstrating and selling housewares in state college dormitories at parties similar to "Tupperware Parties").  Each of the <u>Central Hudson</u> factors is discussed in turn.

### 1. Whether the Advertising Restricted by the Ordinance Concerns an Unlawful Activity or Is Misleading.

The threshold question of the <u>Central Hudson</u> test is whether the commercial speech concerns "lawful activity and not be misleading."  <u>Central Hudson</u>, at 566.  <u>See</u> <u>United States v. Edge Broadcasting</u>, 509 U.S. 418, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993)(federal statute prohibiting radio broadcast of state lottery advertising by broadcaster in state where lotteries are illegal into a state where lotteries are legal does not violate the First Amendment); <u>Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations</u>, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973)(a municipal prohibition on gender-designated advertising columns did not violate newspaper publisher's First Amendment rights where discrimination on basis of gender was made illegal by city ordinance).  Defendants note that it is unlawful to sell tobacco products to anyone under age 18 both under state law, M.G.L. c. 270, §§ 6 & 6A, and city ordinance, Worcester Revised Ordinances, 2008, Part One, c. 8 § 3(f)(1)(See Rushford Affidavit, Exb. 5),

but concede for purposes of their opposition to Plaintiffs' request for a preliminary injunction that the tobacco product advertising which would be restricted by the Ordinance does qualify for First Amendment protection.  See Lorillard Tobacco, supra, at 555.

**2.  The Ordinance Advances a Substantial Government Interest.**

The Central Hudson test requires that "the government must assert a substantial interest in support of its regulation."  Id., 564.

The City government has a substantial interest, indeed a compelling interest, in reducing the number of its residents who suffer the death and illness caused by the consumption of tobacco products.  The interest of the City in enacting the Ordinance was best stated in the words of the Ordinance as follows:

> Now, Therefore, the city council of the city of Worcester, in recognition of the death and devastating effects of tobacco products on the residents of the city of Worcester, is compelled to exercise the authority granted it under its city charter to protect and promote the public health and the authority granted it by the Federal Family Smoking Prevention and Tobacco Control Act of 2009, … to … restrict the advertising of tobacco products to reduce the number of smokers and consequential death and human suffering in the city of Worcester.

Worcester Ordinance of May 10, 2008, Section 1(a)(last para.)(Rushford Affidavit,  Exb. 1).

The City stated this interest after finding that there are an estimated 31,265 adult smokers residing within its jurisdiction (Ordinance Finding #3), that 23.7% of the adults over 18 years of age within its jurisdiction smoke, a level which is 47% higher than the statewide average of 16.1% (Ordinance Finding #4), that cigarette smoking among middle-aged residents (age 45-64) is at the 23.7% level, which is 42% higher than the statewide level of 16.7% (Ordinance Finding #5) and, most morbidly, that tobacco use results in the premature death of approximately five Worcester residents every week, 250 residents every year. (Ordinance Finding #7).

In addition, as part of the enactment of the Ordinance, the City acknowledged and adopted findings made by the Congress of the United States in section two of the Family Smoking Prevention and Tobacco Control Act, Public Law 111-31, June 22, 2009, 123 Stat 1776 (Hereinafter "Tobacco Control Act") and, in so doing, singled out those findings of special

relevance to the city of Worcester.  See, Order adopting Ordinance, Rushford Affidavit Exb. 2. Included therein was a finding that "[r]educing the use of tobacco by minors by just fifty percent would … prevent almost 6,000 of Worcester's children from becoming daily smokers, saving almost 1,800 of them from premature death due to tobacco-induced disease and reducing health care costs by almost $45 million citywide. (Congressional finding # 14)."  Order adopting Ordinance, finding #(6).

In FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000), the Court reviewed the record compiled by the FDA in its attempt to regulate tobacco products under the Federal Food, Drug & Cosmetic Act, 21 U.S.C. § 301, et seq., and concluded:

> In its rulemaking proceeding, the FDA quite exhaustively documented that "tobacco products are unsafe," "dangerous," and "cause great pain and suffering from illness." 61 Fed. Reg. 44412 (1996). It found that the consumption of tobacco products presents "extraordinary health risks," and that "tobacco use is the single leading cause of preventable death in the United States." Id., at 44398.  It stated that "[m]ore than 400,000 people die each year from tobacco-related illnesses, such as cancer, respiratory illnesses, and heart disease, often suffering long and painful deaths," and that "[t]obacco alone kills more people each year in the United States than acquired immunodeficiency syndrome (AIDS), car accidents, alcohol, homicides, illegal drugs, suicides, and fires, combined." Ibid. Indeed, the FDA characterized smoking as "a pediatric disease," id., at 44421, because "one out of every three young people who become regular smokers ... will die prematurely as a result," id., at 44399.

Id., at 134-135.

The interest of the City in enacting the Ordinance is "to reduce the number of smokers and consequential death and human suffering in the city of Worcester" as caused by the "devastating effects of tobacco products."  Ordinance, Section 1(a).  This is a substantial interest.  It is a compelling interest.

The Plaintiffs misread the Ordinance as creating a distinction between adults and minors, something the Ordinance does not do.  They then dismiss the interest in preventing minors from using tobacco products as governed by Lorillard Tobacco, a case which, because of the repeal of federal pre-emption contained in the Tobacco Control Act, is now entirely distinguishable from

the case at bar.  They then ignore the overwhelming public health concerns expressed by the Ordinance and attempt to restate the interests addressed by the Ordinance as simply a paternalistic government wish to prevent 'bad' decisions.

The Plaintiffs' argument that the Ordinance violates their First Amendment rights relies almost entirely on the decision in Lorillard Tobacco, supra.  Lorillard Tobacco involved a challenge to regulations promulgated by the Massachusetts Attorney General which prohibited tobacco product advertising within 1,000 feet of a school or park and imposed other product display requirements at the point of sale.  The Supreme Court held that those regulations failed the Central Hudson test, not because preventing the use of tobacco products by minors was not a substantial government interest, but rather because "the regulations do not satisfy the fourth step of the Central Hudson analysis" because "the governmental interest in protecting children from harmful materials ...  does not justify an unnecessarily broad suppression of speech addressed to adults." Lorillard Tobacco, supra, at 564, quoting Reno v. American Civil Liberties Union, 521 U.S. 844, 875, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (citations omitted). (The third and fourth prongs of the Central Hudson test are discussed infra).

The difference between the substantial interests in the case at bar and the substantial interest in Lorillard Tobacco is as clear as it is extensive.  In Lorillard Tobacco the substantial state interest was limited to minors.  In the case at bar the substantial interest extends to the entire population, a community of over 180,000 residents.[2]  This fundamental difference in the 'substantial government interest' advanced by these enactments is a function of the removal of federal preemption accomplished by the Tobacco Control Act.  When Lorillard Tobacco was decided, state and local authority was severely limited by the pre-emption provision of the Federal Cigarette Labeling and Advertising Act (FCLAA), 79 Stat. 282, as amended, 15 U.S.C. § 1331 et seq., which read as follows:

---

[2] 181,045, with approximately 140,000 adults and 40,000 minors. U.S. Census Bureau, 2009 & 2010 estimates.

> No requirement or prohibition based on smoking and health shall be imposed under state law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the [warning label] provisions of this chapter.

15 U.S.C. § 1334(b).  The FCLAA's pre-emption provision denied states and localities the exercise of their general police power authority to enact laws regulating tobacco products based on concerns about smoking and health.  However, this pre-emption did not apply to minors: "The FCLAA does not pre-empt state laws prohibiting cigarette sales to minors." Lorillard Tobacco, supra, at 552.  Therefore, the Court in Lorillard Tobacco, as well as three of the parties to this case,[3] concluded that the state interest in preventing minors from using tobacco products satisfied the substantial interest test. "With respect to the second step, none of the petitioners contests the importance of the State's interest in preventing the use of tobacco products by minors." Lorillard Tobacco, supra, at 555.

Eight years after Lorillard Tobacco, Congress substantially reversed the FCLAA's pre-emption provision:

> (c)  EXCEPTION.—Notwithstanding subsection (b), a State or locality may enact statutes and promulgate regulations, based on smoking and health, that take effect after the effective date of the Family Smoking Prevention and Tobacco Control Act, imposing specific bans or restrictions on the time, place, and manner, but not content, of the advertising or promotion of any cigarettes.

(Tobacco Control Act of 2009,  Title II, section 203, of the Act, as it amends section 5 of the Federal Cigarette Labeling and Advertising Act, at 15 U.S.C. § 1334)(There are several remaining elements of the federal pre-emption provision but none are relevant to the case at bar).

The Tobacco Control Act not only repeals federal pre-emption, it empowers states and localities to exercise their general police powers to adopt "more stringent" measures "relating to or prohibiting the sale, distribution, possession, exposure to, access to, advertising and promotion of, or use of tobacco products by individuals of any age…" Tobacco Control Act, Title I, section 916 (emphasis added).  With this newly expressed authority, and in the absence of federal pre-

---

[3] Plaintiffs R.J. Reynolds Tobacco Company, Philip Morris USA Inc. and Lorillard Tobacco Company.

emption, the Ordinance was enacted as a measure relating to the "exposure to" and "advertising and promotion of" tobacco products by individuals "of any age" within its jurisdiction.

As a result of the repeal of federal pre-emption and the authorization to adopt "more stringent" measures in the Tobacco Control Act, the City has legal authority to enact measures designed to promote the health and safety of all of those within its jurisdiction.  The Plaintiffs do not question the validity of the Ordinance as a lawful exercise under state law of the police power of the city, as a political subdivision of the state, to protect the public health and public safety of the community.  The Ordinance is squarely grounded upon such authority.  "The police power of the state must be held to embrace, at least, such reasonable regulations established directly by legislative enactment  as will protect the public health and the public safety." Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11, 25, 25 S.Ct. 358 (1905) (upholding Massachusetts statute authorizing boards of health to require mandatory vaccinations during a smallpox epidemic). See American Lithuanian Naturalization Club, Athol, Mass., Inc. v. Board of Health of Athol, 446 Mass. 310, 844 N.E.2d 231 (2006) (Upholding local board of health regulation prohibiting smoking in the enclosed areas of membership associations as a lawful exercise in the interest of public health); Cf. Tri-Nel Mgt., Inc. v. Board of Health of Barnstable, 433 Mass. 217, 741 N.E.2d 37 (2001) (upholding as "within the standard of reasonableness" a local board of health regulation prohibiting smoking in all food service establishments, lounges, and bars due to the dangers of environmental tobacco smoke).

Therefore, the City's interest in reducing the number of smokers and consequential death and human suffering caused by the consumption of tobacco products is distinguishable from the interest under review in Lorillard Tobacco because it extends, not just to minors, but to the entire community within its boundaries.  This interest qualifies as a substantial interest under the second prong of the Central Hudson test.

The Plaintiffs misrepresent the City's interest, saying that the Ordinance fails to state a substantial government interest because it is trying solely "to prevent them [adults] from making 'bad' decisions."  Plaintiffs' Memo, p. 8.  Plaintiffs' argument ignores the substantial interest in

reducing the death and adverse health consequences caused by tobacco products in orders of magnitude that not only reach extraordinary levels, but also exceed all other major causes of premature death *combined*.  See FDA v. Brown & Williamson Tobacco Corp., supra, at 134-135. The Plaintiffs cite three cases that support their restated (and faulty) premise, Sorrell v. IMS Health Inc., --- U.S. ---, 131 S.Ct. 2653 (June 23, 2011); 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) and Thompson v. Western States Medical Center, 535 U.S. 357, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002).  These cases do not detract from the substantial interest that supports the enactment of the Ordinance.

Sorrell reviewed Vermont's Prescription Confidentiality Law, a law that prohibited the sale, disclosure or use in marketing of pharmacy records that reveal the prescribing practices of individual doctors.  The Court found that "there is no need to determine whether all speech hampered by [the Vermont law] is commercial, as our cases have used that term." Sorrell, Slip Op. 16, S.Ct. 2666.  Rather, the Court concluded: "Vermont's law imposes a content- and speaker- based burden on respondents' own speech … and  requires heightened judicial scrutiny."  Id., at 14, S.Ct. 2666.  The Court saw Vermont as trying to advance its policy preference for preventing pharmaceutical companies from influencing physicians' prescription-writing practices through the use of "detailers" who obtain a physician's personal prescription writing history to market their proprietary drugs.  Sorrell is distinguishable from the case at bar because the City's interest supporting the Ordinance is not a mere policy difference on the question whether people should smoke cigarettes, it is a question of saving lives, reducing serious illness and reducing expenses, all caused by a product that, when used as intended by its manufacturers, inflicts death and destruction on a massive scale.

The Plaintiffs next cite 44 Liquormart a case that involved a Rhode Island prohibition on price advertising on alcoholic beverages.  44 Liquormart was a judgment followed by a bevy of plurality opinions.  The Plaintiffs attribute to the "Court" statements made by only four justices, Justices Stevens, Kennedy, Souter and Ginsburg. (Plaintiffs' Memo, p. 10).  Those four justices, and not the Court, "rejected" the state's attempt to justify the price ban as pertaining to a "vice

activity." <u>Id.</u>, at 513-514.[4]   The City does not argue that the use of tobacco products represents a "vice" and therefore, ipse dixit, gives it a substantial interest under <u>Central Hudson</u>.  The City argues that it has a substantial interest in the health of its residents and that tobacco products are in a unique category because they cause such extensive harm when used for their intended purposes.  There was no evidence or statements in <u>44 Liquormart</u> that alcoholic beverages caused a harm on a scale anywhere as extensive as the harm caused by tobacco products amply demonstrated in the case at bar.  The Rhode Island law reviewed in <u>44 Liquormart</u> is also distinguishable because it prohibited any expression of price in the content of every alcoholic beverage ad in the hope of reducing alcohol consumption by preventing lower prices.  The Ordinance does not involve tobacco product pricing, nor does it restrict what tobacco purveyors may say in their advertising.  It does restrict, in the nature of a time, place and manner restriction, the placement of tobacco advertising in the community.

The last case cited by the Plaintiffs in their faulty "adults only-bad choices" argument is <u>Thompson v. Western States Medical Center</u>, <u>supra</u>.  Again, the Plaintiffs misquote the case. They say that, in asserting a substantial interest, "[t]he government argued that advertising compounded drugs could lead adults 'to convince their doctors to prescribe' them unnecessarily." (memo, p. 16, quoting from <u>Thompson</u>, at 374.).  The quoted sentence in that case begins with the qualifier "Even if the government had argued …".  <u>Id</u>.  The accurate statement of the government's argument supporting its advertising restriction appears on page 368 of the case, where the Court stated: "[t]he government asserts three substantial interests underlie the [advertising restriction]."  <u>Id.</u>, at 368.  None of those three interests involved doctors succumbing to advertising induced patient pressure.[5]   The Court held, not that the government's stated interests were not substantial, but that "the government has failed to demonstrate that the

---

[4] The Plaintiffs apparently agree with Rhode Island's theory that higher prices will reduce consumption when they argue later (memo, p. 17) that the City should have attempted to increase tobacco taxes to reduce tobacco consumption.

[5] The substantial interests cited by the Court were: 1) preserving the integrity of the federal FDA drug approval process; 2) preserving the availability of compound drugs for those patients who need them; and, 3) achieving a balance between those two interests.

speech restrictions are not more extensive as necessary to serve those interests."  Id., 371 (internal quotation makes omitted).  Therefore, Thompson was decided on the fourth prong of Central Hudson and it does not support the Plaintiffs' "bad decisions" argument on the application of the second prong of Central Hudson.

The Plaintiffs' arguments fail to demonstrate that the City lacks a substantial interest in reducing, citywide, the number of smokers and consequential death and human suffering caused by the consumption of tobacco products.  This interest is distinguishable from Lorillard Tobacco and satisfies the second prong of the Central Hudson test.

### 3.  The Ordinance Directly Advances the City's Interest in Preventing the Extensive Death and Adverse Health Consequences of Tobacco Use by Reducing the Level of Tobacco Consumption in the City.

The third step of Central Hudson concerns the relationship between the harm that underlies the government interest and the means identified by the government to advance that interest. Central Hudson describes this test as requiring that the regulation "must be in proportion to" the government interest motivating the regulation. Id., at 564.  Other cases have expressed this test as requiring that the restriction on commercial speech "directly and materially" advances the stated government interest, Florida Bar v. Went For It, Inc., supra, at 623-624, or that there be a "reasonable fit" between the government's regulation and the substantial governmental interest sought to be served, Board of Trustees of State University of New York v. Fox, supra, at 480, or that the restriction will in fact alleviate the harms motivating the enactment "to a material degree." Edenfield v. Fane, supra, at 770-771.

Whether phrased in terms of proportionality, reasonableness, directness or materiality, the Central Hudson test requires an intermediate level of judicial scrutiny, not strict judicial scrutiny. As such, Central Hudson requires only "that there be a 'reasonable fit' between the government's regulation and the substantial governmental interest sought to be served."  Board of Trustees of State University of New York v. Fox, supra, at 480.  In calibrating the proportionality of the advertising restriction to the extent of the harm caused by tobacco products, Central Hudson does

not require the City to present "empirical data ... accompanied by a surfeit of background information." <u>Florida Bar v. Went For It, Inc.</u>, <u>supra</u>, at 627-628.  Rather, <u>Central Hudson</u> permits "litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even … to justify restrictions based solely on history, consensus, and 'simple common sense.' " <u>Id</u>.  The often-quoted expression that <u>Central Hudson</u> requires more than "mere speculation or conjecture" does not enhance the intermediate level of judicial scrutiny, but is the result of a case where a government board presented absolutely no studies nor any anecdotal evidence to support a restriction on direct solicitation by certified public accountants.  <u>Edenfield v. Fane</u>, <u>supra</u>, at 771.

Advertising is directly related to consumption and the reduction of advertising accomplished by the Ordinance will directly advance the City's interest in reducing the consumption of tobacco products and the death and human suffering they cause.  This conclusion is supported by caselaw, findings made by the U.S. Food and Drug Administration, findings made by the U.S. Congress, findings made by the Worcester City Council and 'simple common sense.'

A. *Caselaw*.  In <u>Central Hudson</u> itself, the Court reviewed a utility commission regulation that prohibited electric utility companies from advertising for the purpose of promoting demand for electricity and stated: "[T]he State's interest in energy conservation is directly advanced by the Commission order at issue here. There is an immediate connection between advertising and demand for electricity." <u>Central Hudson</u>, <u>supra</u>, at 569.  In <u>Posadas de Puerto Rico v. Tourism Co. of Puerto Rico</u>, 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986), the Court concluded that "the restrictions on advertising of casino gambling 'directly advance' the legislature's interest in reducing demand for games of chance." <u>Id.</u>, 342.  In <u>United States v. Edge Broadcasting Co.</u>, <u>supra</u>, the Court upheld a federal law prohibiting radio broadcasters from advertising state lotteries if the broadcasters are located in states where lotteries are illegal:

> Within the bounds of the general protection provided by the Constitution to commercial speech, we allow room for legislative judgments.  Here, as in <u>Posadas de Puerto Rico</u>, the Government obviously legislated on the premise that the advertising of gambling serves to increase the demand for the advertised product. … If there is an

immediate connection between advertising and demand, and the federal regulation decreases advertising, it stands to reason that the policy of decreasing demand for gambling is correspondingly advanced. Id., 434-435. (quotations and internal citations omitted).

These cases alone support the conclusion that the advertising restrictions of the Ordinance will directly advance the City's interest in reducing the consumption of tobacco products within the city of Worcester.

B. *FDA findings.* In Lorillard Tobacco the Court noted that the state cited numerous studies supporting the conclusion that advertising of tobacco products increases consumption of tobacco products. Id., 557. The Court noted that the state relied in part "on evidence gathered by the Food and Drug Administration (FDA) in its attempt to regulate the advertising of cigarettes and smokeless tobacco." Id., referring to: Regulations Restricting the Sale and Distribution of Cigarettes and Smokeless Tobacco Products to Protect Children and Adolescents, FDA Proposed Rule, 60 Fed.Reg. 41314 (1995); and, Regulations Restricting the Sale and Distribution of Cigarettes and Smokeless Tobacco to Protect Children and Adolescents, FDA Final Rule, 61 Fed.Reg. 44396 (1996).[6]

In its rule-making proceedings the FDA found "evidence confirming advertising's effect on consumption and the effectiveness of advertising restrictions on reducing youth smoking." 61 Fed.Reg. 44396 at 44494, citing 60 FR 41314 at 41333. FDA further found that "international experience provides empirical evidence that restrictions on tobacco advertising, when given appropriate scope and when fully implemented, will reduce cigarette and smokeless tobacco use among children and adolescents under the age of 18." Id.

In the same proceedings, the FDA asserted that "a preponderance of the quantitative and qualitative studies of cigarette advertising suggested: (1) A causal relationship between tobacco advertising and tobacco use by young people, and (2) a positive effect of stringent advertising measures on smoking rates and on youth tobacco use." 61 Fed. Reg. 44396, at 44466. The FDA

---

[6] While the Court later held that the FDA lacked statutory authority to regulate tobacco products, see FDA v. Brown & Williamson Tobacco Corp., supra, the studies and conclusions of the FDA that advertising affects demand for tobacco product remain valid.

indicated that it "relied heavily" on the National Academy of Sciences Institute of Medicine's (IOM's) Report entitled <u>Growing Up Tobacco Free, Preventing Nicotine Addiction in Children and Youths,</u> Washington, DC 1994 (the IOM Report) and the Department of Health and Human Services' (DHHS') Centers for Disease Control and Prevention's (CDC's) Report entitled <u>Preventing Tobacco Use Among Young People, A Report of the Surgeon General (1994),</u> concluding that both reports "indicated that advertising was an important factor in young people's tobacco use, and that restrictions on advertising must be part of any meaningful approach to reducing smoking and smokeless tobacco use among young people. <u>Id.</u>

The Court in <u>Lorillard Tobacco</u> noted that "[t]he FDA also made specific [similar] findings with respect to smokeless tobacco" <u>Id.,</u> 559, and that "[s]tudies have also demonstrated a link between advertising and demand for cigars, <u>Id.,</u> 560, and found that the regulations under review satisfied the third prong of the Central Hudson test.  <u>Id.,</u> 561.

C. *Congressional findings.*  The Congress, in enacting the Tobacco Control Act of 2009, made numerous findings detailing the devastating health effects of tobacco products and supporting the link between tobacco product advertising and tobacco product consumption.  The Order adopting the Ordinance, see Rushford Affidavit Exb. 2, incorporated eleven of the Tobacco Control Act findings made by Congress.  Those findings included findings that:

> In 2005, the cigarette manufacturers spent more than $13,000,000,000 to attract new users, retain current users, increase current consumption, and generate favorable long-term attitudes toward smoking and tobacco use.  (Tobacco Control Act finding # 16 – Order Finding #7);

> Tobacco advertising expands the size of the tobacco market by increasing consumption of tobacco products including tobacco use by young people.  (Tobacco Control Act finding # 22 – Order Finding #8);

> Comprehensive advertising restrictions will have a positive effect on the smoking rates of young people and adults.  (Tobacco Control Act finding # 25 – Order Finding #9);

> Restrictions on advertising are necessary to prevent unrestricted tobacco advertising from undermining legislation prohibiting access to young people and providing for education about tobacco use.  (Tobacco Control Act finding # 26 - Order Finding #10); and,

International experience shows that advertising regulations that are stringent and comprehensive have a greater impact on overall tobacco use and young people's use than weaker or less comprehensive ones. (Congressional finding # 27 - Order Finding #11).

D. *Common sense*.  Lastly, valid restrictions on commercial speech may be based "solely on history, consensus, and 'simple common sense.' " <u>Florida Bar v. Went For It, Inc.</u>, <u>supra</u>, 627-628 (citations and internal quotation marks omitted).  It stands to reason that, since advertising increases consumption of a product, a reduction in advertising will reduce consumption of that product.  The Court in <u>Central Hudson</u> noted: "Central Hudson would not contest the advertising ban unless it believed that promotion would increase its sales." <u>Id.</u>, 569.  This expression of 'simple common sense' was made by the Court in <u>United States v. Edge Broadcasting Co.</u>, <u>supra</u>, in upholding a casino gambling advertising restriction: "We think the legislature's belief is a reasonable one, and the fact that appellant has chosen to litigate this case all the way to this Court indicates that appellant shares the legislature's view." <u>Id.</u>, 342.

Based on the caselaw, the FDA studies, the Congressional findings and simple common sense, an ordinance that reduces exposure to tobacco advertising will directly and materially advance the goal of reducing tobacco consumption.  The Ordinance satisfies the third prong of the <u>Central Hudson</u> test.

Plaintiffs' contention (Plaintiffs' Memo, pp. 11-12) that the third prong of <u>Central Hudson</u> demands a "rigorous evidentiary showing" is plainly wrong as they misstate the <u>Central Hudson</u> standard in an attempt to impose a strict scrutiny analysis.  Their argument ignores the articulation of the intermediate "proportional, reasonable, direct or material" standard contained in the cases cited in the first paragraph of this section (See pp. 14-15, <u>supra</u>).  Instead, Plaintiffs rely predominantly on a plurality opinion of Justices Stevens, Kennedy, Ginsburg and Thomas in <u>44 Liquormart, Inc. v. Rhode Island</u>, <u>supra</u>.  While the justices in that case expressed a variety of personal opinions, none commanded a majority and none speak for the Court.  <u>44 Liquormart</u> did not articulate a new standard for the third prong of the <u>Central Hudson</u> test.

The Plaintiffs argue that tobacco product advertising is "already subject to numerous restrictions." Plaintiffs' Memo, p. 12. It is incongruous to claim that the Ordinance will not directly advance the City's interest in reducing tobacco consumption among its population because other restrictions on tobacco advertising are in place. The Ordinance is not duplicative of any existing measure and there is still a high rate of tobacco consumption within the community.

The Plaintiffs first cite the federal statutory ban on radio and television advertising of cigarettes and little cigars. See, 15 U.S.C. § 1335. That act of Congress restricting tobacco advertising does not violate the First Amendment: "Whether the Act is viewed as an exercise of the Congress' supervisory role over the federal regulatory agencies or <u>as an exercise of its power to regulate interstate commerce, Congress has the power to prohibit the advertising of cigarettes in any media</u>." <u>Capital Broadcasting Company v. Mitchell</u>, 333 F.Supp. 582, 584 (D.C. 1971)(emphasis added), affirmed sub. nom. <u>Capital Broadcasting Co. v. Kleindienst</u>, 405 U.S. 1000, 92 S.Ct. 1289, 31 L.Ed.2d 472 (1972).

If anything, the <u>Capital Broadcasting</u> cases upholding the federal ban on radio and television advertising supports the conclusion that the City's advertising restriction directly advances the City's interest in reducing tobacco consumption:

> Written messages are not communicated unless they are read, and reading requires an affirmative act. Broadcast messages, in contrast are 'in the air.' In an age of omnipresent radio, there scarcely breathes a citizen who does not know some part of a leading cigarette jingle by heart. It is difficult to calculate the subliminal impact of this pervasive propaganda, which may be heard even if not listened to, but it may reasonably be thought greater than the impact of the written word.

<u>Capital Broadcasting Company v. Mitchell</u>, <u>supra</u>, 586. Outdoor public advertising, advertising which would be prohibited by the Ordinance, is also "in the air." It is omnipresent and unavoidable.[7] Outdoor tobacco advertising does not require the conscious act of reading, but it

---

[7] As stated by Justice Brandeis in <u>Packer Corporation v. State of Utah</u>, 285 U.S. 105, 110, 52 S.Ct. 273, 76 L.Ed. 643 (1932): "Advertisements of this sort [billboards and street car placards] are constantly before the eyes of observers on the streets and in street cars to be seen without the exercise of choice or volition on their part. Other forms of advertising are ordinarily seen as a matter of choice on the part of the observer. The young people as well as the adults have the message of the billboard thrust upon them by all the arts and devices that skill can produce."

is viewed by everyone passing by on the public streets whether they stop and enter the retail establishment or not, whether they are going to work, to church, the movies or shopping for bread and milk.  As such, indiscriminate outdoor advertising of tobacco products has the same "subliminal impact" that was properly characterized by the court in Capital Broadcasting as "pervasive propaganda."  Except, in the case of tobacco, the subliminal impact is not to propagandize for political purposes, but to make commercial transactions which, when made, induce an addiction that will, for most, last a lifetime, albeit a lifetime which will end prematurely for five Worcester residents every week.

The Plaintiff's point secondly to the Master Settlement Agreement that they "entered into with the states in 1998" which, "to resolve litigation, contains further advertising restrictions." Plaintiffs' Memo, p. 12.  As an agreement to resolve litigation, the Plaintiffs entered into the Master Settlement Agreement of their own volition and not in compliance with any governmental regulation.  The Central Hudson analysis of whether a governmental restriction on advertising "reasonably fits" a substantial governmental interest does not, nor should not, depend on how much a commercial enterprise has limited itself in the exercise of First Amendment rights.  No commercial entity seeking to market its products utilizes every conceivable avenue of communication available to it and, to the extent that the Plaintiffs have decided not to utilize certain advertising media to promote the sale of their products, those business decisions are binding only on themselves and not the government exercising its police power to prevent death and disease.  Additionally, any such private self-restriction is transitory as it may be renegotiated by the parties at any time without regard to the government interest in reducing tobacco consumption in Worcester.  Central Hudson looks at whether the means implemented by the Ordinance are reasonably likely to advance the substantial interests of the Ordinance, and not whether the Plaintiffs have denied themselves other otherwise available advertising options.

Plaintiffs then point to the impending advertising restrictions contained in the Tobacco Control Act of 2009.  Plaintiffs' Memo, p. 12.  First, the Tobacco Control Act does not contain the advertising restriction which is contained in the Ordinance.  The fact that provisions of the

Tobacco Control Act may affect other advertising practices of the Plaintiffs depending on the outcome of litigation pending elsewhere does not bear on the point in question, whether the Ordinance will reasonably advance the City's interest in reducing tobacco consumption.  Second, Plaintiffs belie their argument with the admission in footnote six (Plaintiffs' Memo, p. 13) that the federal advertising provisions of the Tobacco Control Act of 2009 are being challenged in a case now pending in the U.S. Court of Appeals for the Sixth Circuit.  The fact that those advertising restrictions may never go into effect makes them equally irrelevant to the case at bar. If anything, the Tobacco Control Act's reversal of federal pre-emption and its language authorizing states and localities to adopt "more stringent" measures establishes a federal policy of deference to local measures.  That the Plaintiffs may already be subject to other restrictions, some of which may or may not go into effect, does not justify the argument that they should not be subject to an additional restriction that satisfies the <u>Central Hudson</u> test.

Lastly, the Plaintiffs' assert (Plaintiffs' Memo, p. 13)  that the "City did not adduce a shred of evidence" in support of its conclusion that the Ordinance directly advances the interests of the City.  This assertion ignores the mountains of evidence referenced in Congressional findings, the FDA findings and the preamble to the Ordinance.  That evidence supports the conclusion that the Ordinance will reduce the death and disease caused by tobacco products because advertising affects consumption and a reduction in tobacco advertising will reduce tobacco consumption. Plaintiffs argue that the Ordinance will not pass the "directly advances" prong because, in light of the "numerous restrictions" already imposed on tobacco, any effect of the Ordinance will be marginal.  They cite a recent Supreme Court decision, <u>Brown v. Entertainment Merchants Association</u>, No. 08-144, Slip Op. at 16, n. 9 (U.S. June 27, 2011), for the proposition that "the government does not have a compelling interest in each marginal percentage point by which its goals are advanced."  First, <u>Entertainment Merchants</u> is distinguishable from the case at bar in that it involved the application of strict scrutiny to a state law restricting violent video games. The Court found that California failed to "show a direct causal link between violent video games and harm to minors." <u>Id.</u>, at 7.  Second, the Plaintiffs' "marginal percentage point" argument

fails to recognize the enormity of the public health consequences of their products.  Based on the finding that a 50% reduction in tobacco use by minors would prevent almost 6,000 of Worcester's children from becoming smokers and save almost 1,800 of them from premature death, (see City Council finding #6, Tobacco Control Act finding # 14, Rushford Affidavit, Exb. 2), a single percentage point reduction in tobacco use by minors would prevent nearly 120 Worcester children from becoming smokers and prevent approximately 36 of them from premature death.  Tobacco lives in the land of large numbers where even a marginal percentage point gain will have a dramatic and substantial, life and death, result for a large number of people.

The Central Hudson test involves intermediate scrutiny, and not the rigorous evidentiary showing argued by the Plaintiffs.  It requires that there be a "reasonable fit" between the Ordinance and the interests served by it , Board of Trustees of State University of New York v. Fox, supra, at 480, and it allows "room for legislative judgments." United States v. Edge Broadcasting Co., supra, at 434-435.  The City has produced caselaw and a compelling 'surfeit of empirical data' incorporated by reference that supports the 'simple common sense' conclusion that restricting a form of tobacco advertising that is directed to the general community will reduce the level of death and disease suffered by the general community and which is caused directly by the consumption of tobacco.  The Ordinance satisfies the third prong of the Central Hudson test.

### 4. The Ordinance is Not More Extensive Than Necessary To Serve The Substantial Interest Supporting It.

The last prong in the Central Hudson analysis "complements" the third step, "asking whether the speech restriction is not more extensive than necessary to serve the interests that support it." Lorillard Tobacco, supra, 556.  The Court, in Florida Bar v. Went For It, Inc., supra, summarized the elements of this analysis as follows:

> With respect to this prong, the differences between commercial speech and noncommercial speech are manifest. In Fox, we made clear that the "least restrictive means" test has no role in the commercial speech context.  What our decisions

> require, instead, is a 'fit' between the legislature's ends and the means chosen to accomplish those ends, a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served,' that employs not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective.

Id., at 632, citing Board of Trustees of State University of New York v. Fox, supra, at 480 (internal quotation marks omitted).

There is clearly a reasonable fit between the advertising restriction and the interest of the City in reducing the unfathomable damage to the public health caused by the high number of individuals in the community who consume tobacco products. The Ordinance prohibits one form of tobacco advertising, advertising which is directed indiscriminately to anyone going about their business on public roads and at public parks and schools. The Ordinance does not regulate tobacco product advertising using any other medium of communication. It does not prohibit direct mail advertising, email advertising, internet advertising, advertising in magazines or newspapers and other publications. It does not prevent the Plaintiffs from using text messaging, telephone, including cellular phone or smart phone communications applications, word of mouth and other forms of oral exhortation to market tobacco products. The Ordinance will prevent non-smokers, ex-smokers, non-tobacco users, adults and children alike, from inadvertent solicitations to commence an addiction to a lethal product.

The interest of the City in reducing the number of tobacco users and consequential death and human suffering caused by tobacco products necessarily encompasses the entire community and the means chosen to address it focus on the one form of tobacco advertising which is directed to the entire community. The scope of the remedy is in proportion to the scope of the harm, a harm which is so extensive as to claim more lives than alcohol, homicides, illegal drugs, suicides, car accidents, fires and AIDS combined. FDA v. Brown & Williamson Tobacco Corp., supra, at 134-135.

The Ordinance does not prohibit or attempt to regulate tobacco product advertising inside of retail establishments (except to prevent using indoor advertising as a means of directing advertising outside of the retail establishment).

Contrary to the Plaintiffs' claims, the Ordinance does not prohibit "point of sale" advertising. Three of the Plaintiffs describe the Ordinance as impairing their ability to engage in "point of sale" advertising. Their affidavits discuss the Ordinance solely in terms of "point of sale" advertising. See, Plaintiff Philip Morris USA Inc., Gifford Affidavit ¶¶ 1, 4, 5 & 6; Plaintiff R.J. Reynolds Tobacco Company, Karrow Affidavit ¶¶ 1, 5, 6 & 7); and, Plaintiff Lorillard Tobacco Company, Sparrow Affidavit ¶¶ 1, 4, 5 & 6.

The Ordinance restricts advertising which "can be viewed from any street or park shown on the Official Map of the city." It does not restrict advertising <u>inside</u> of any retail establishment, the "point of sale." The Plaintiffs attempt to obscure this distinction by referring to the Ordinance as "indoor tobacco advertising that can be seen from the street." Plaintiffs' Memo, p. 3. The mechanics of the Ordinance focus on the audience to whom the advertising is directed as it restricts advertising which is displayed outwardly to the general community, outdoors, on the city streets, schools and parks. The Ordinance does not restrict advertising within a retail establishment which is directed inwardly to the customers in the establishment. The Ordinance does not prohibit every possible viewing of a tobacco product by someone with their nose pressed to the store window: "the incidental visibility of tobacco products through a window at a retail establishment would not qualify as 'advertising' under the ordinance." See, Plaintiffs' Complaint, ¶ 28, n. 1, quoting an interpretation letter of the city solicitor.

That such an ordinance enacts an outdoor advertising restriction and not a "point-of-sale" restriction was plainly clear to the Court in <u>Lorillard Tobacco</u>. In addition to the restriction on advertising within 1,000 feet of a school or playground, the regulations reviewed by the Court included a prohibition against displaying tobacco products "lower than five feet from the floor of any retail establishment which is located" within 1,000 feet of a school or playground. <u>Id.</u>, 535. The Court referred to these regulations separately as "governing outdoor and point-of-sale advertising." <u>Id.</u>, 546. On numerous subsequent occasions in its decision the Court distinguished between the outdoor advertising restriction and the indoor "point-of-sale" restrictions. <u>Id.</u>, 548, 551, 552, 556, 561, 562, 563, 564, 566. The difference between an outdoor advertising

restriction and a point-of-sale advertising restriction is obvious: the "point-of-sale" is where the transaction occurs and the product and money change hands, not where a car passes by on the street outside of the store, or where a child enters and exits an elementary school 180 days a year, or where a family enjoys a softball game or concert in a city park.

This blurring in the Plaintiffs' argument of the distinction between advertising focused outdoors and advertising focused on the point-of-sale is belied by the clearly stated description of their advertising policies posted on their websites. Plaintiff Philip Morris USA Inc., through its parent company, Altria Group, Inc., posts its marketing policies on its website, www.altria.com, which, after listing all of the media it does not use for tobacco marketing, states that its tobacco companies, Plaintiff Philip Morris included, instead:

> Use one-to-one consumer communications, such as direct mail or email, consumer websites, and certain other consumer marketing activities, that involve self-imposed minimum age requirements of 21 years of age or older and age verification procedures.
>
> Present their brands and communications to adult tobacco consumers in retail stores where they make their final brand selection.

Magee Affidavit ¶ 11, Exb. 2. Plaintiff Lorillard Tobacco includes as part of its published advertising policy a statement that it, as a signatory of the Master Settlement Agreement, agreed to "end all outdoor advertising." See, www.lorillard.com/?s=marketing+ practices as viewed July 11, 2011. Magee Affidavit, ¶ 12, Exb. 3. Plaintiff R.J. Reynolds Tobacco publishes as its "Guiding Principles and Beliefs" the statement: "The marketing of tobacco products should not be targeted to minors and non-tobacco consumers." www.rjrt.com/prinbeliefs.aspx. Magee Affidavit, ¶ 13, Exb. 4.

These marketing policies point away from the indiscriminate display of advertising to the general public while in public and towards advertising that "end[s] all outdoor advertising" (Plaintiff Lorillard Tobacco); advertising which is not "targeted to minors and non-tobacco consumers" (Plaintiff R.J. Reynolds Tobacco) and advertising that presents branded tobacco communications "to adult consumers in retail stores where they make their final brand selection"

(Plaintiff Philip Morris).  The Ordinance does not conflict with these advertising policies and does not interfere with the relationship between any of the Plaintiffs and their existing customers or customers of competing brands.  It does not prevent the Plaintiffs from communicating with all such customers at the point of sale.  The Ordinance would prevent the general community from indiscriminately disseminated offers to become addicted, or enhance or resume their pre-existing addiction, to a product which is inherently dangerous in that it causes death due to cancer and heart disease, as well as other serious adverse health effects.  (See, Tobacco Control Act findings #'s 2 & 3).  That the Ordinance is consistent with the published marketing policies of the Plaintiffs shows that it is not more extensive than necessary to serve the interests that support it.

The Plaintiffs misstate the requirements of the "narrowly tailored" prong of the Central Hudson test.  They begin by citing Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985) as support for their statement that: "narrow tailoring requires the City to distinguish the truthful from the false, the helpful from the misleading and the harmless from the harmful." (Plaintiffs' Memo, p. 14).  However, Zauderer was not decided on the "narrowly tailored" prong of Central Hudson.  It did not even address the "narrowly tailored" prong of Central Hudson.  The attorney solicitation prohibition at issue in Zauderer could not pass the second prong of the Central Hudson test because the state of Ohio could not identify a substantial interest supporting it.  Zauderer, 639.  The Court indicated that the solicitation prohibition, at best, "strongly suggests that the purpose … is to ensure that attorneys advertise 'in a dignified manner'." Id., 648.  The Court rejected this suggestion, saying that, while the state has a substantial interest in maintaining attorney dignity in the courtroom, "we are unsure that the State's desire that attorneys maintain their dignity in their communications with the public is an interest substantial enough to justify the abridgement of their First Amendment rights." Id.  The City has identified the substantial interest supporting the Ordinance: it does not wish to reduce tobacco consumption because it is not dignified, the City wishes to reduce tobacco consumption because it kills people.  It has enacted an ordinance which reasonably and

directly advances that interest within a scope which is proportionate to the interest served. Zauderer does not address the 'narrowly tailored' prong and the Plaintiffs' reference it to define that prong is, itself, false and misleading.

The Plaintiffs then cite Lorillard Tobacco as support for their argument that the Ordinance is not narrowly tailored. The last prong of the Central Hudson test was the "critical inquiry" in the Lorillard Tobacco case. Id., at 569. This is the prong that provided the basis for the Court's holding that invalidated the state prohibition on tobacco advertising within 1,000 feet of a school or park. "[T]he regulations do not satisfy the fourth step of the Central Hudson analysis" because "the governmental interest in protecting children from harmful materials ...  does not justify an unnecessarily broad suppression of speech addressed to adults." Id., at 564. As discussed above, pp. 9-11, the difference that makes the holding in Lorillard Tobacco inapplicable to the case at bar is the difference between the interests advanced by the enactments under review. Lorillard Tobacco was based on a state interest which was limited by federal pre-emption to preventing tobacco use by minors only. That pre-emption has been removed and replaced with a federal empowerment to enact "more stringent" measures "relating to or prohibiting the sale, distribution, possession, exposure to, access to, advertising and promotion of, or use of tobacco products by individuals of any age…" Tobacco Control Act, Title I, section 916 (emphasis added). Under Central Hudson, the Ordinance is valid if it is in proportion to this goal. The interest advanced by the Ordinance reaches every individual in public places within its jurisdiction and the Ordinance is narrowly tailored in that, while advancing that goal, it involves a singular form of advertising.

Plaintiffs next argue that the city "banned speech as the first strategy rather than the last resort." Memo,  p. 17. Nothing could be further from the truth. The City has taken over time an extensive array of measures, both legislatively and programmatically, to achieve its goal of preventing premature deaths and disease by reducing tobacco consumption. The City's legislative strategies commenced on October 9, 1984 with the enactment of an ordinance prohibiting the distribution of free tobacco products on any public street or sidewalk, or in any

public park or playground, or any other public ground, or in any public building in the city. Rushford Affidavit, Exb. 3.  On February 13, 1990, the City enacted an ordinance banning the sale of tobacco products to minors and requiring tobacco retailers to post a notice that sales to minors are prohibited.  Rushford Affidavit, Exb. 4.  In 1997 the city council included a non-binding question on its municipal election ballot asking the voters whether they would "support adoption of a city ordinance which would prohibit smoking in all buildings open to the public." That question received 15,202 votes in favor and 6,277 votes against, a margin of 71% in favor and 29% opposed.  Rushford Affidavit, ¶ 6.  The legislative strategy expanded to the current tobacco products control ordinance which spans eight pages of the City's ordinances and includes: a ban on the sale of loose cigarettes or other tobacco products; a ban on the sale of tobacco products via unsupervised self service displays; a ban on the sale of tobacco products in buildings owned or operated by the city; a requirement that tobacco retailers obtain a tobacco sales permit; a ban on vending machine sales of tobacco products; a prohibition on smoking in municipal buildings and workplaces in the city; a ban on smoking within fifty feet of the entrances to all municipal buildings and all health care institution located in the city; and, the regulation of smoking bars, "cigar bars" and "hookah bars."  See, Rushford Affidavit, Exb. 5.

At the time the advertising restriction in the Ordinance was adopted, the City also enacted a ban on the sale of tobacco products in pharmacies, a ban on the sale of "blunt wraps" otherwise know as "cigar wraps" and a ban on the sale of tobacco products on the campuses of institutions of higher education.  Rushford Affidavit, Exb. 1.  The preamble to the Ordinance, Section 1 (a)(9), summarizes the litany of measures taken by the City to achieve its goal of preventing premature deaths and disease by reducing tobacco consumption.  Rushford Affidavit, Exb. 1.

In addition to these legislative efforts, the City Department of Public Health instituted a variety of programs and enforcement activities, including retailer compliance testing, youth and adult educational initiatives and community-based organizations informational and cessation activities.  Magee Affidavit ¶ 7 and Attachment 1.  The City has and continues to follow best

practices from the CDC in order to reduce tobacco use and exposure to secondhand smoke. Magee Affidavit ¶ 7, Attachment 1.

The City's efforts run parallel to a progression of federal measures focusing on the use of tobacco products. "Congress has enacted six separate pieces of legislation since 1965 addressing the problem of tobacco use and human health." See FDA v. Brown & Williamson Tobacco Corp., supra, at 143. The Court in FDA v. Brown & Williamson reviewed in great detail the history of the regulation of tobacco products over 35 years beginning with the Surgeon General's Report of January 11, 1964. (Id., see pp. 143-156). The City's advertising restriction is not a "first strategy," but rather follows in a long line of measures designed to curb tobacco use in Worcester.

The Plaintiffs also suggest that the City could have "increased taxes" to attain its goal. Plaintiffs' Memo, p. 17. Plaintiffs fail to recognize that the City does not possess general taxing authority under state law and has no ability to impose taxes on tobacco products. See, MASS. CONST. Amend. Art. 2, § 7, adopted by Amend. Art. 89. Even then, taxes on tobacco products in the City have increased significantly over time while the rate of tobacco consumption remains higher than the statewide average. The state increased taxes on a package of cigarettes four times in the last twenty years: 25¢ in 1992; 25¢ in 1996; 75¢ in 2002; and, $1.00 in 2008; and the federal government has increased its tax on cigarettes 66¢ in 2009. Magee Affidavit, ¶ 14.

The history of the City's progression of regulatory measures, tobacco enforcement actions, educational programs, public health initiatives and increased taxes, all suggested by the Plaintiffs as strategies which could reduce tobacco consumption in the City, have still failed to bring the smoking rate among adults in the City at least down to the statewide average. The advertising restriction in the Ordinance comes only after the City has been addressing the consumption of tobacco products within its jurisdiction for decades and leaves the Plaintiffs' argument that the City as "eschewed a full arsenal of options short of restricting speech" as baseless. The Ordinance enacted by the City satisfies the "narrowly tailored" prong of the Central Hudson test because it is not more extensive than necessary to serve the interests that support it.

**B.**     <u>**The Remaining Preliminary Injunction Factors**</u>.

    While in no way diminishing the enormity of the harm caused by tobacco consumption and noting that the Ordinance was enacted to serve the public interest, the Defendants recognize that these factors are contained in the substantive law governing the claims raised in this case and, therefore, request that the Plaintiffs' motion for a preliminary injunction be decided on the 'likelihood of success on the merits' factor. See, <u>New Comm Wireless Services, Inc., v. SprintCom, Inc.</u>, <u>supra</u>, at 9 (The "sine qua non of this four-part inquiry is likelihood of success on the merits.").

**Conclusion**

    For the reasons stated above, Plaintiffs' request for a preliminary injunction should be denied because the Plaintiffs do not have a likelihood of success on the merits of their claims.

                        CITY OF WORCESTER
                        B. DALE MAGEE, and
                        MICHAEL V. O'BRIEN,
                        By their attorneys,

                        /s/ David M. Moore_____
                        David M. Moore (BBO #352580)
                        City Solicitor
                        City Hall, Room 301
                        455 Main Street
                        Worcester, Massachusetts 01608
                        Telephone: (508) 799-1161
                        Moored@worcesterma.gov

<u>CERTIFICATE OF SERVICE</u>

    I, David M. Moore, hereby certify that, on this 8th day of August, 2011, the within Opposition was filed through this Court's electronic filing system (ECF) and will be sent electronically to all registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

                        /s/ David M. Moore_____